[Civ. No. 11798.   First Dist., Div. Two.   Nov. 28, 1941.]

Estate of HERMINIA PERALTA DARGIE, Deceased. ANTONIO RODRIGUEZ MARTIN, Appellant, v. PE-RALTA P. WILSON, As Administrator With the Will Annexed, etc., et al., Respondents.

W. H. Metson and P. H. McCarthy, Jr., for Appellant.

James W. Hickey, Raymond G. LaNoue, Hugo P. Correll, Morgan J. Doyle, J. Joseph Sullivan and Robinson, Price & MacDonald for Respondents.

DOOLING, J. *pro tem.*—Appeals are presented on a single bill of exceptions from an order of the probate court denying a motion of appellant to vacate and set aside a decree made and entered on June 1, 1937, determining interests in the above entitled estate; from a decree of partial distribution; and from an order directing and instructing the administrator with the will annexed to pay the inheritance tax on appellant's distributive share of the property in the estate.

There have been three previous appeals in the matter of this estate which will be found reported in 216 Cal. 667 [15 Pac. (2d) 849]; 19 Cal. App. (2d) 215 [64 Pac. (2d) 1131]; and 33 Cal. App. (2d) 148 [91 Pac. (2d) 126]. In the decision in 19 Cal. App. (2d) 215, to which reference is made for a statement of the provisions of the will of Mrs. Dargie, this court made the following order: "The decree appealed from is reversed and the trial court is directed to reframe its findings and conclusions in accordance with the foregoing views and enter a judgment and decree accordingly." Upon

the going down of the *remittitur* on that appeal the probate court made and entered its decree or order of June 1, 1937, determining interests. This decree recites the taking of the appeal, the rendition of the judgment on the appeal, the filing and entry of a certified copy of the opinion in the records of the trial court and then proceeds: "This court, pursuant to said opinion and said judgment of said District Court of Appeal, having made its findings of fact and conclusions of law in conformity with said opinion and judgment of said District Court of Appeal.

"(1) It is therefore hereby ordered, adjudged and decreed, etc."

From this recital it appears that the probate court attempted and purported to carry out the mandate of this court in its opinion in 19 Cal. App. (2d) 215.

Specifically that decree contained among others the following provisions:

"(2) It is further ordered, adjudged and decreed that the legacy of $50,000.00 to decedent's sister, Josefa Peralta Wilson, provided for in paragraph XXIV of said will, at the rate of $1,000.00 a month is payable from dividends within the ordinary meaning of the term 'dividends' derived and to be derived after the date of the death of the said decedent from the assets of her estate, and said monthly payments of $1,000.00 each are respectively due and payable from the time of the receipt by the executors or special administrators of said estate of such dividends from the said estate sufficient in amount to pay them.

"(3) It is further ordered, adjudged and decreed that all the legacies provided for in paragraphs III to XXVII, inclusive, of decedent's will other than the aforesaid legacy of $50,000.00 to Josefa Peralta Wilson are or will become due and payable from accumulation of dividends within the ordinary meaning of the term, 'dividends'; when the executors or special administrators have received from dividends from the assets of said estate the sum of $239,000.00 such legacies other than said sum of $50,000.00 may be paid out of said dividends one or more at a time as soon as possible therefrom, and all such legacies are to be paid to the persons or parties to whom they are made and as set forth in subdivision (1–a) of this decree, or to their successors in interest respectively. . . .

"(6) It is further ordered, adjudged and decreed that it is proper and necessarily permissible for the representatives of the estate of said decedent to utilize at any time and from time to time during the pendency of the administration of said estate any funds belonging to said estate from whatever source for the payment of expenses of administration, debts of decedent, property and income tax on said estate and Federal Estate taxes, but upon and after the accrual of the right of any cash legatees to any distribution said representatives may be required from the *corpus* of the estate to reimburse the dividend fund, specified as aforesaid by the testatrix as the source of payment of such cash legacies, to the extent that such dividend fund may have been utilized by such representatives in the payment of such estate obligations, but the payment of each of such cash legacies shall in each instance be dependent upon the status of the estate with reference to the payment or provision for payment of debts of the decedent and expenses of administration, and no testamentary disposition shall be payable so long as there remains unpaid or unprovided for any debt, debts of the decedent, or expense or expenses of administration, unless at the same time provision is made for the payment thereof, and reserving to said cash legatees all the rights, if any provided for by Sections 1000 to 1003, both inclusive, of the Probate Code of California. No legacy, bequest or devise or inheritable or distributive share of said estate shall be paid or delivered without deduction therefrom and payment of any and all inheritance and other taxes that may be chargeable upon or a lien against them."

A reading of the opinion in 19 Cal. App. (2d) 215, will show that paragraphs (2) and (3) above quoted were made pursuant to the order and direction of this court. It is appellant's position that paragraph (6) above quoted is in conflict with the mandate of this court and therefore void upon its face. A careful reading of our opinion in 19 Cal. App. (2d) 215, satisfies us that this position is not well taken. In that opinion this court did not consider or decide the question whether if debts and expenses of administration were paid from accumulated dividends, the dividend fund might later be restored from other assets of the estate. We did say in that opinion at p. 221:

"In an endeavor to reenforce their contentions the respondents place a strained interpretation on words contained

in paragraph 30 (2d). They emphasize the words 'the full half of my estate'. They contend that expression refers to the amount of the estate as it stood at the time of the death of the testatrix. The contention offends the intelligence of the testatrix. (1) She knew she was in debt $120,000. (2) She knew the administration of her estate would create a large expense. (3) She knew her last illness and burial would create other large expenses. (4) And she also knew that she had provided cash legacies in the sum of $239,000. She provided expressly how the fourth item was to be paid. She expressly provided that the third item was to be paid. And, although no express language was inserted as to how items one and two were to be paid there was no language to the effect they would not be paid; but, it is presumed she knew they would be paid together with all taxes. It is patent that the full half of her estate could be conveyed only after such charges were deducted.''

This language is not inconsistent with the construction that the *corpus* of the estate may be looked to for the payment of debts and expenses of administration. Indeed it contains the implied finding that it may be looked to for that purpose. The opinion likewise contains no direction express or implied that if accumulated dividends should be used for that purpose the dividend fund could not be replenished to a like amount from other sources.

In *English* v. *Olympic Auditorium, Inc.,* 10 Cal. App. (2d) 196 [52 Pac. (2d) 267], the court said at p. 201:

''The directions of a court of review for the modification or reversal of a judgment, when the cause is not remanded for a new trial, may ordinarily be divided into two general classes. The appellate tribunal adopts a written opinion determining the issues on appeal and directs that the judgment be modified or reversed accordingly, in which event the opinion becomes a part of the decision and instructions, vesting the trial court with a sound discretion to determine what the reviewing court decided thereby. In the other class of instructions the appellate court may adopt a written opinion determining the issues on appeal and modify or reverse the judgment, specifically directing the lower court with respect to particular issues. In the last mentioned class of cases the trial court has no discretion to interpret the opinion of the

appellate court, but, on the contrary, it is bound to specifically carry out the instructions of the reviewing court.''

The directions of this court in 19 Cal. App. (2d) 215, fall into the first class. Appellant took no steps by appeal or otherwise to set aside the decree of June 1, 1937, until long after it had become final and immune from direct attack.

The order for partial distribution was made to the cash legatees from the dividend fund after reimbursement from the *corpus* of the estate. It followed paragraph (6) of the decree of June 1, 1937, above quoted and was authorized thereby. That decree having become final the decree of partial distribution made pursuant to its terms was valid.

There is another reason why these decrees must be held immune to attack by appellant. The bulk of the stock in the estate from which dividends might be derived to pay the cash legacies was sold and the sale upheld in 33 Cal. App. (2d) 148. Appellant in the probate court filed a pleading in the matter of that sale, verified by himself, in which he alleged:

''That a sale of assets of said estate is necessary in order to pay the cash legacies, debts, expenses of administration and inheritance taxes due by said estate, and there are no assets of said estate sufficient in value or amount to pay the same, except the said shares of stock of said corporations owned by said estate, and therefore a sale of the said shares is necessary for such purposes.''

Having taken the position in the probate court that it was proper to pay the cash legacies from the sale of assets and, although he later opposed confirmation of the sale on other grounds, never having departed from that position until the judgment of this court in 33 Cal. App. (2d) 148, affirming the order confirming the sale had become final, he may not now change his position. The only shares from which sufficient dividends to pay the cash legacies might be expected were the subject of this sale. Unless the cash legacies are paid from the *corpus* of the estate they can now for the most part never be paid. It is reasonable to assume that the beneficiaries of these legacies would themselves have opposed the sale if they had then been advised of appellant's present position. Appellant cannot at this late date change position to their detriment. (*Estate of Davis*, 38 Cal. App. (2d) 579,

584 [101 Pac. (2d) 761, 102 Pac. (2d) 545]; *Donegan* v. *City of Los Angeles,* 109 Cal. App. 673 [293 Pac. 912].)

On the appeal from the order directing the administrator with the will annexed to pay the inheritance tax assessed against appellant it is appellant's position that at the time of the testatrix' death he was an Honorary Vice-Consul of Spain and as such exempt from the tax by virtue of a treaty between Spain and the United States of America.    (33 Stat. (U. S.), Part 2, 2105.)

The pertinent portions of that treaty provide:

## "Article XIII

"Each of the High Contracting Parties pledges itself to admit the Consuls-General, Consuls, Vice-Consuls and Consular Agents of the other in all its ports, places and cities, except where it may not be convenient to recognize such functionaries.

"This reservation, however, shall not be applied by one of the High Contracting Parties to the other unless in like manner applied to all other Powers.

## "Article XIV

"Consular officers shall receive after presenting their commissions, and according to the formalities established in the respective countries, the exequatur required for the exercise of their functions, which shall be furnished to them free of cost; and on presentation of this document, they shall be admitted to the enjoyment of the rights, privileges and immunities granted to them by this Treaty. . . .

## "Article XV

"All consular officers, citizens or subjects of the country which has appointed them . . . shall . . . be exempt from all National, State, Provincial and Municipal taxes except on real estate situated in, or capital invested in the country to which they are commissioned. . . . ''

Appellant was appointed Honorary Vice-Consul on October 19, 1929.    The testatrix died on December 8, 1929.    Appellant's exequatur was issued to him by the Department of State on December 18, 1929.    Since the right to the inheritance tax vests in the state at the time of death (*Estate of Woodard,* 153 Cal. 39 [94 Pac. 242]), it follows that appellant's right to claim an exemption from the tax is dependent

upon whether the provisions of article XV of the treaty with Spain became effective as to him on the date of his appointment or on the date of the issuance to him of the exequatur.

A proper construction of the language of the treaty seems to us to compel the conclusion that the date of issuance of the exequatur is the controlling date.

Looking to the language of article XIV it first provides that consular officers after presenting their commissions shall receive free of cost "the exequatur *required* for the exercise of their functions" and it then proceeds: "on presentation of this document, they shall be admitted to the enjoyment of the rights, privileges and immunities granted to them by this Treaty."

The clear meaning of this language seems to us to show the intentional understanding of the high contracting parties to be that no consular officer should exercise his functions until the exequatur had been issued to him but that upon its issuance or presentation to him he would thereby be admitted to the enjoyment of the rights, privileges and immunities granted by the treaty.

Appellant argues for another construction. It is his contention that under the language of the treaty the exequatur is merely an evidence of consular authority, not the source of it. The difference between the two constructions depends entirely on the sense in which the word "presentation" is to be construed. The appellant would have us construe it to mean that on presentation of the exequatur *by* the consular officer to any person or official that person or official shall be bound to admit him to the enjoyment of the rights, privileges and immunities granted by the treaty. This construction appears to us to be a strained one. We think the natural meaning of the words used, particularly in view of the context, is that on presentation of the exequatur *to* him by the State Department the consular officer is thereby admitted to the enjoyment of such rights, duties and privileges.

While the language of the treaty must prevail over general custom established under international law, the construction which we place upon the language of article XIV comports with such general custom.

"A consul being in a foreign country derives his authority, in effect, from both governments. He receives his commission from the country which he represents and receives his exequatur from the country to which he is sent. It is, in

truth, solely by virtue of the authority vested in him by the country to which he is sent that he is able to exercise his official functions within its territorial limits." (16 Am. Jur. 962, 963.)

This being the general custom it should take clear language in the treaty to indicate that the high contracting parties intended to depart from it. There is not such clear language in article XIV. Giving the language used its natural effect it indicates an intention to follow established custom rather than to depart from it.

Appellant emphasizes the language of article XIII, "each of the High Contracting Parties pledges itself to *admit* the Consuls-General . . . of the other in all its ports, places and cities," and argues that by virtue of that language the issuance of the exequatur as a source of consular authority is dispensed with. This does not necessarily follow. The United States of America bound itself to admit consular officers of Spain and to issue its exequatur to them. It did not contract that they should be entitled to exercise consular authority before the issuance of the exequatur.

A simple illustration will emphasize the distinction. If A sells and transfers property to B, B thereby at once becomes the owner. If A contracts to sell property to B, B does not thereby become the owner although B has the legal right and A has the correlative legal duty under the contract to transfer the property to B and thereby make B the owner. So here, as we construe the language of the treaty, the United States of America was bound by its terms to issue the exequatur to a regularly commissioned consular officer of Spain, but until its issuance despite this duty the person to whom the commission was issued was not admitted to the status of a consular officer.

The decree and orders appealed from are affirmed.

Nourse, P. J., and Spence, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied January 27, 1942. Carter, J., voted for a hearing.